UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>     Plaintiff,<br><br>    v.<br><br>ROBERT RUBEN ORNELAS,<br><br>     Defendant. | Case No.: SACR 14-00183-CJC<br><br><br>ORDER DENYING DEFENDANT'S MOTIONS TO SUPPRESS EVIDENCE (STATEMENTS NO. 1 AND NO. 2) |

## I.  INTRODUCTION

Defendant Robert Ornelas is currently charged with two counts of engaging in illicit sexual conduct in a foreign place in violation of 18 U.S.C. § 2423(c), three counts of production of child pornography outside of the United States in violation of 18 U.S.C.

§ 2251(c), and one count of possession of child pornography in violation of 18 U.S.C. §§ 2252A(a)(5)(B),(b)(2).  Before the Court are Defendant's motions to suppress two sets of statements he made to law enforcement on June 11, 2013, and all evidence derived from those statements.  (Dkt. 57 ["Mot. I"]; Dkt. 73 ["Mot. II"].)  For the following reasons, the motions are DENIED.

## II.  BACKGROUND

On June 11, 2013, fifteen state and federal law enforcement officers from Department of Homeland Security, Immigration and Customs Enforcement, Federal Bureau of Investigation ("FBI"), and Newport Beach Police Department ("NBPD") executed a search warrant at Defendant's residence.  (Mot. I at 1; Dkt. 70 ["Opp. I"] at 3.) These officers were all part of the Orange County Child Exploitation Task Force.  (Mot. I at 1.)  Of those fifteen, eight armed officers constituted the "entry team," and five other armed officers secured the perimeter.[1]  (Opp. I at 4–5.)

Just before the execution of the search warrant, a victim whom Defendant had allegedly molested when she was a child called Defendant and spoke to him for an hour; at the time, Defendant did not know that law enforcement had coordinated this call. (Mot. I at 2–3; Opp. I at 5–6.)  Law enforcement recorded this conversation.  (Mot. I at 3.)  After the call ended, the entry team came to Defendant's front door to execute the warrant.  (Opp. I at 6.)  Defendant lived with his brother and mother, but at the time the search warrant was executed, law enforcement made arrangements with Defendant's family members to make sure that he would be home alone.  (Mot. I at 2; *id.* Ex. B ["Ross Ornelas Decl."] ¶ 3.)

---

[1] At the evidentiary hearing, the Government explained that the two remaining members of the team were computer forensics specialists.

The entry team lined up in front of Defendant's front door. (Opp. I at 4–5.) A member of the entry team knocked on the door and announced the officers' presence, but there was initially no response.[2] (Opp. I at 6; Declaration of Kevin Radisay ["Radisay Decl."] ¶¶ 7–8.)[3] Special Agent Kevin Radisay then walked from his position at the end of the entry team to the front door, carrying a battering ram. (Opp. I at 6; Radisay Decl. ¶ 8.) At that point, the doorknob "jiggled" and Agent Radisay put the battering ram to the side. (Opp. I at 6; Radisay Decl. ¶ 9.) Defendant then opened the door. (Opp. I at 6; Radisay Decl. ¶ 9.) The entry team instructed Defendant to raise his hands and exit the house but he did not comply. (Opp. I at 6; Radisay Decl. ¶ 9.) Agent Radisay "approached [Defendant] and escorted him outside of the house" and "proceeded to handcuff [Defendant] while a protective sweep of the residence was completed and [sic] for his safety and the safety of the agents/officers conducting the sweep." (Opp. I at 6; Radisay Decl. ¶ 10.) Once the residence was secured, the officers returned most of their weapons and protective gear to their cars and then began searching the home. (Opp. I at 6–7.)

After ten to fifteen minutes, Detective David Syvock approached Defendant and identified himself as a detective with the NBPD and a Task Force Officer for the Orange County Child Exploitation Task Force. (Opp. I at 7; Declaration of Robert Ornelas ["Defendant Decl."] ¶ 14.) While Detective Syvock removed Defendant's handcuffs, he told Defendant that he was not under arrest and was free to leave. (Opp. I at 7; Declaration of David Syvock ["Syvock Decl."] ¶ 10.) Detective Syvock asked Defendant "if he was interested in hearing about the investigation resulting in the search of his

---

[2] Defendant denies that the agents knocked and announced their presence and that they instructed him to raise his hands and exit the residence after he opened the door. (Dkt. 81 ["Reply I"] at 5, n.5). After hearing the testimony of the witnesses at the evidentiary hearing, however, the Court finds the agents did in fact knock and announce their presence and give Defendant those instructions.

[3] The Government provides eight declarations in support of its opposition, but does not present them as separate exhibits. They are appended to the end of the opposition brief with non-consecutive pagination, so the Court cites to these declarations as though they are independent documents. (*See* Dkt. 70.)

house, and [Defendant] indicated that he was interested." (Syvock Decl. ¶ 10.) Defendant then followed Detective Syvock to his backyard patio where the officers had set up three chairs that were taken from inside the house—one for Defendant, which was facing the house, and two for the officers, facing Defendant's chair with their backs to the house. (*Id.* at ¶¶ 14–15.) The patio was open-aired and full of plants. (Opp. I Ex. B.) There were no officers blocking the sliding glass doors between the house and the patio and none stationed in the backyard.[4] (Syvock Decl. ¶ 14; Declaration of Kelly Kottas ["Kottas Decl."] ¶ 13; Evidentiary Hearing Ex. 1.)

*1. Statements Made at Defendant's Home.* Special Agent Kelly Kottas and Detective Syvock conducted the interview. (Opp. I at 7.) They were part of the perimeter team, not the initial entry team, and they were wearing plain clothes. (Syvock Decl. ¶¶ 9, 15; Kottas Decl. ¶¶ 9, 14.) Defendant did not know that they were videotaping the interview. (Defendant Decl. ¶ 18.)

The Government provided, and the Court has reviewed, the videotape of the interview, which lasted approximately one hour and twenty minutes. (Opp. I Ex. B.) The Court makes the following observations. At the outset of the interview, Defendant walked into the backyard and sat down in the chair facing the house. (Opp. I Ex. B at 12:39:15.) Detective Syvock and Defendant were already in the middle of a conversation about Defendant's elderly mother by the time Defendant sat down. (*Id.*) Defendant was expressing concern about his mother's health and safety, apparently because he did not want her to come home and see law enforcement searching the house. (*Id.* Ex. B at 12:39:15–12:39:51.) Detective Syvock asked Defendant for a telephone phone number

---

[4] Defendant states that there was an armed officer observing the interview from inside the house, and another one stationed in the backyard. (Defendant Decl. ¶ 16.) There is no dispute that no one was standing in front of the door to block Defendant's exit, and after hearing the testimony of the witnesses at the evidentiary hearing, the Court finds that there is no reliable evidence showing that there was an officer stationed in the backyard or an officer continually looking at the interview from inside the house.

that law enforcement could use contact Defendant's brother, Ross Ornelas, to tell him that they were serving a search warrant and that he should not bring the mother back to the house yet. (*Id.* Ex. B at 12:39:51–12:40:35.)  Agent Kottas went in to find the phone number while Detective Syvock said he "totally understands" Defendant's concern and wanted to make sure they address it. (*Id.* Ex. B at 12:40:35–12:40:45.)

Detective Syvock then said "Before we get started, I want to let you to know that nobody is under arrest, okay, you are free to leave.  If you chose so, the only thing we ask is if you do leave, let us know where you're going so that we can make sure we secure your property and stuff like that," at which point Agent Kottas came back with a piece of paper to confirm with Defendant that it was the right phone number to contact his brother. (*Id.* Ex. B at 12:40:45–12:41:24.)  As Detective Syvock spoke, Defendant nodded in agreement and occasionally said "okay." (*Id.*)  Detective Syvock then said "so anyway, notwithstanding that, I would like to certainly have the opportunity to explain to you about our investigation and what brought us to your house today.  Okay? And, I mean, we're sitting out back of your house, I—I didn't want to do this out front because your neighbors are coming out, I don't want to embarrass you and put you in that situation, okay? So I just want to make sure you understand that." (*Id.* Ex. B at 12:41:25–12:41:48.)  At that point, Defendant began searching through his pockets and explained he was looking for a hair tie but could not find one, so Detective Syvock asked where in the house he might have one so that an officer could try to retrieve one for him. (*Id.* Ex. B at 12:41:53–12:42:13.)

Detective Syvock then showed Defendant his government identification, explained that the officers were all part of the Orange County Child Exploitation Task Force, and began to lay out the logistics of their search. (*Id.* Ex. B at 12:42:16–12:46:20.)  Defendant occasionally nodded in agreement. (*Id.*)  At one point, Defendant interrupted Detective Syvock to say that these descriptions were unnecessary and that they should

"move on," but Detective Syvock insisted on continuing his explanation.  (*Id.* Ex. B at 12:45:15–12:46:00.)  Detective Syvock then began to ask Defendant questions about his possession of child pornography and related allegations.  (*Id.* Ex. B at 12:46:00.)  Throughout the questioning, Defendant remained calm and often nodded or chimed in to agree with the detective's statements.  Detective Syvock and Agent Kottas occasionally confronted Defendant with inconsistencies in his statements in a manner showing that they did not believe what Defendant was saying, but the conversation stayed calm and civil—they did not use an aggressive tone or threaten Defendant, and Defendant remained calm whenever he disagreed with their characterizations.  (*See, e.g.*, *id.* Ex. B at 13:07:07–13:08:46, 13:37:57–13:38:17, 13:52:17–13:52:56).

Toward the end of the interview, while Detective Syvock was asking about a child victim's allegations of sexual abuse by Defendant, Defendant stated that he was tired and needed to stand up.  (*Id.* Ex. B at 13:53:03.)  Without asking for permission he stood up while Detective Syvock asked "Do you want to walk around?", and Defendant asked how much longer the interview would last.  (*Id.* Ex. B at 13:53:03–13:53:08.)  In response, Detective Syvock asked how much more time Defendant would give them to discuss the victim's allegations and whether he had someplace else he needed to be.  (*Id.* Ex. B at 13:53:08–13:53:30.)  Defendant did not respond and instead asked whether the search of the house was finished, and Detective Syvock indicated that he was not sure, while Agent Kottas chimed in to tell Defendant that they had found child pornography.  (*Id.* Ex. B at 13:53:30–13:54:08.)  Detective Syvock asked a few more follow up questions, (*id.* Ex. B at 13:56:27–13:56:53), and then asked if Defendant would "stick around" while they finish the search, to which Defendant said he would.  (*Id.* Ex. B at 13:57:37–13:57:42.)  Detective Syvock asked if Defendant wanted to "sit somewhere more comfortable" or stay in the backyard, and Defendant said that he wanted to stand.  (*Id.*)  Defendant asked if he could go in the house, and Detective Syvock responded that Defendant could not while the search was ongoing but he was "certainly free to leave."  (*Id.* Ex. B at

13:57:42–13:58:14.)  Detective Syvock then asked Defendant for his keys so they could search his car and other locked areas of the house.  (*Id.* Ex. B at 13:59:14.)  The interview concluded after Defendant gave the officers directions on where to find certain keys.  (*Id.* Ex. B at 13:59:14–13:59:31.)

*2. Statements Made in the Squad Car.*  Shortly after the interview ended, and while the search was still ongoing, Orange County Sheriff's Department arrested Defendant on child molestation charges.  (Mot. I at 3.)  Orange County Sheriff's Department Investigators B. Jasper and E. Arredondo came to transport Defendant to jail.  (Dkt. 98 ["Opp. II"] at 5.)  The Government provided, and the Court has reviewed, the audio recording of the exchange between Investigator Jasper and Defendant, most of which appears to have taken place while they were driving to jail in the squad car.  (Opp. I Ex. 2.)  At the outset of this exchange, Investigator Jasper advised Defendant of his rights outlined in *Miranda v. Arizona*, 384 U.S. 436 (1966), as follows:

> Q: It's 1530 hours on July 11, 2013.  You asked about your rights, so I just wanted to make sure you understand them.  You have the right to remain silent.  Do you understand?
>
> A: Yes.
>
> Q: Anything you say may be used against you in court.  Do you understand?  Yes or no?
>
> A: Yes.
>
> Q: You have the right to an attorney before or during any questioning.  Do you understand?  Yes?  They make me ask you yes or no at the end of each one.
>
> A: Yes.
>
> Q: If you cannot afford an attorney one will be appointed for you. Do you understand that?

A: Yes.

(Opp. Ex. 2 at 00:43–01:06.)  A minute of silence followed, and then, Investigator Jasper asked Defendant about the temperature in the car.  (*Id.* Ex. 2 at 02:09.)  After about three more minutes of silence, the recording was muffled for a moment but then Investigator Jasper said "Yep.  15 years.  15.  You were a teacher?  Substitute teacher. What did you do for full-time?"  (*Id.* Ex. 2 at 05:19.)  Investigator Jasper and Defendant continued on to have a casual conversation about Defendant's work as a teacher, pensions, political parties, school politics, and Defendant's worker's compensation and medical malpractice claims.  (*Id.* Ex. 2 at 05:19–16:50.)  Defendant was talkative and eager to share his views. (*Id.* Ex. 2 at 17:06–27:38.)  At one point during this exchange, Defendant said "If I get too political just tell me to shut up."  (*Id.* Ex. 2 at 10:10–10:12.)  As the discussion of politics continued, Investigator Jasper said that he is a Republican, and then laughed and said he was "just kidding" while Defendant insisted "No, no.  That's ok," and then continued sharing his in-depth views on political parties.  (*Id.* Ex. 2 at 11:01–12:15.) After a few seconds of silence, Investigator Jasper said "Let me ask you this," to which Defendant responded "Please."  (*Id.* Ex. 2 at 12:40–12:42.)  Investigator Jasper then asked him whether there is a "liberal slant" in schools.  (*Id.* Ex. 2 at 12:42–12:47.)

About ten minutes into the conversation, the following exchange took place:

A: You taught 10 to 13-year olds.  Are any of those images that were recovered at your house any of your former students?

A: No.

Q: Never?

A: Never.

Q: How come?  I mean, just out of curiosity.

A: No, that's fine.

Q: I mean, because obviously that's what you are attracted to.

(*Id.* Ex. 2 at 16:50–17:06.)  This was the first time the investigator elicited incriminating information from Defendant.  Defendant began to explain his relationship with his students, and the investigator asked follow up questions about Defendant's possession and use of child pornography.  (*Id.* Ex. 2 at 17:06–27:38.)  At one point, Investigator Jasper asked Defendant what types of child pornography Defendant liked to view, and Defendant casually said "I don't want to get into detail about that," and changed the topic of conversation by saying he was surprised that the authorities were not pursuing the "providers" of child pornography.  (*Id.* Ex. 2 at 19:36–19:55.)

Toward the end of the exchange, as they were nearing the jail the investigator warned Defendant that for his own safety he should not tell the other inmates what his charges were because of the stigma associated with child molestation.  (*Id.* Ex. 2 at 27:38–28:57.)  Defendant asked whether he would have to share a cell with other inmates, and stated that it was his first time in jail.  (*Id.* Ex. 2 at 28:57–29:15.)  Defendant explained his concern by stating "Talking to you about other topics has been fine, but now we're getting to the serious part."  (*Id.* Ex. 2 at 29:17–29:21.)  The investigator then asked one follow up question: "I just, out of curiosity, before I go in, are any of those pictures of children that you know and want to tell me about?"  (*Id.* Ex. 2 at 29:35–29:40.)  They spent a few more minutes talking about child pornography images, and Defendant remarked "I appreciate you being respectful."  (*Id.* Ex. 2 at 29:40–32:18.)  They then exited the car and briefly discussed booking procedures before the recording ends.  (*Id.* Ex. 2 at 32:44–36:57.)

//

//

//

//

## III.  DISCUSSION

The Fifth Amendment guarantees that no person "shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.  In *Miranda*, the Supreme Court adopted "procedural safeguards" to protect this privilege within the inherently coercive environment of custodial interrogation.  *Miranda*, 384 U.S. at 444.  Namely, "[p]rior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.  The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently."  *Id.* at 444–45.  "Statements elicited in noncompliance with this rule may not be admitted for certain purposes in a criminal trial."  *Stansbury v. California*, 511 U.S. 318, 322 (1994).

*Miranda* warnings are only required, however, when a suspect is both in custody and subject to interrogation.  *Miranda*, 384 U.S. at 444.  Interrogation consists of "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."  *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).  A suspect is in custody when he is "deprived of his freedom of action in any significant way."  *Miranda*, 384 U.S. at 444.  "To determine whether the suspect was in custody, we first examine the totality of the circumstances surrounding the interrogation.  We then ask whether a reasonable person in those circumstances would 'have felt he or she was not at liberty to terminate the interrogation and leave.'"  *Craighead*, 539 F.3d at 1082 (quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)) (internal citations omitted).

Defendant now moves to suppress the statements that he made to law enforcement at his home and in the squad car on the basis that they were taken in violation of his Fifth

Amendment privilege against self-incrimination.  (Mot. I; Mot. II.)  The Court will consider each set of statements in turn.

### A. Statements at the House

Defendant contends that his house constituted a police-dominated environment at the time he was questioned, meaning that he did not believe he was free to leave or terminate the questioning.  (Mot. I at 7.)  The parties do not appear dispute that the interview at his home constituted "interrogation" and that Defendant was not given *Miranda* warnings prior to this questioning.  (*See generally* Mot. I; Opp. I.)  The issue, rather, is whether the environment of the questioning was custodial such that *Miranda* warnings should have been given and a waiver of those rights should have been obtained prior to the questioning.  *See Miranda*, 384 U.S. at 444.

In *Craighead*, the Ninth Circuit developed a special framework to account for the "uniqueness of an interrogation conducted within the suspect's home."  *Craighead*, 539 F.3d at 1082.  The Court explained that "several factors are relevant to whether the circumstances of [a suspect's] interrogation effected a police-dominated atmosphere: (1) the number of law enforcement personnel and whether they were armed; (2) whether the suspect was at any point restrained, either by physical force or by threats; (3) whether the suspect was isolated from others; and (4) whether the suspect was informed that he was free to leave or terminate the interview, and the context in which any such statements were made."  *Id.* at 1084.

This list of factors, however, "should not be interpreted as an exhaustive pronouncement."  *Id.*  "An interrogation conducted within the suspect's home is not *per se* custodial.  On the contrary, courts have generally been much less likely to find that an interrogation in the suspect's home was custodial in nature."  *Id.* at 1083.  This is a fact-

intensive inquiry, *id.* at 1084, which depends on "the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned," *Stansbury*, 511 U.S. at 323.  Defendant argues that the *Craighead* factors weigh in favor of a finding of custody—the Court considers Defendant's arguments concerning each factor in turn.

### 1.  The Number of Officers and Whether They Were Armed

Regarding the first factor, Defendant points out that "no less than fifteen law enforcement personnel from at least three different agencies who were part of a federal-state task force participated in and executed the search warrant at the residence" and "easily saturated" the area.[5]  (Mot. I at 9.)  *Craighead* explained that "when the number of law enforcement personnel far outnumber the suspect, the suspect may reasonably believe that, should he attempt to leave, he will be stopped by one of the many officers he will encounter on the way out" or that armed officers make his home "no longer safe from the threat of police force."  *Craighead*, 539 F.3d at 1084–85.

In *Craighead*, eight armed officers from three different law enforcement agencies came to the defendant's home located on a military base to execute a search warrant after finding probable cause to believe that the defendant was distributing child pornography.  *Id.* at 1077–78.  Some were wearing protective vests and others had unholstered their weapons.  *Id.* at 1078.  While the warrant was being executed, a special agent introduced herself and another agent to the defendant, told him that any statement he might make

---

[5] The Government explains that the number and arrangement of armed officers here was typical, because two agents were needed to clear each room, and "suspects in child exploitation investigations have committed suicide when confronted by law enforcement or engaged officers in gun fire."  (Opp. I at 4; Declaration of Ronald Perez ¶ 6.)  However, the Ninth Circuit has explained that "[t]he fact that these precautions may be necessary to the success of the lawful search does not lessen their tendency to make a reasonable person believe he is in custody."  *Craighead*, 539 F.3d at 1084.  Therefore, that this number was typical does not, on its own, weigh against a finding of custody.

would be voluntary, and that he was not under arrest and would not be arrested regardless of the information he provided that day. *Id.* However, the defendant testified that the presence of three different agencies lead him to doubt whether she was speaking for all the agencies present. *Id.* The Court concluded that a reasonable person in his position "would feel that his home was dominated by law enforcement agents and that they had come prepared for a confrontation." *Id.* at 1085.

Here, Defendant points out that he witnessed almost double the number of armed law enforcement officers as that in *Craighead* approach his home, which "shocked and intimidated" him. (Mot. I at 9; Defendant Decl. ¶ 4.) However, Defendant concedes that the officers were all "part of a federal-state task force," (Mot. I at 9), and that "Detective David Syvock appeared to be in charge," (Defendant Decl. ¶ 5). Therefore, this case is unlike *Craighead*, where the defendant was not sure that the agent spoke on behalf of all the officers when she told him he was not under arrest and was free to leave. *Craighead*, 539 F.3d at 1084. Instead, when Detective Syvock removed Defendant's handcuffs as he told Defendant that he was not under arrest and was free to leave, it was clear to Defendant that Detective Syvock spoke for everyone present. (Syvock Decl. ¶ 10). Before Detective Syvock asked Defendant questions in the backyard, he stated again that Defendant was not under arrest and was free to leave, and he also confirmed that the officers worked for a single task force. (Opp. I Ex. B at 12:42:27.) Therefore, the large number of police officers here may have understandably intimidated Defendant at first, but given what transpired before the questioning began, Defendant could not reasonably have had the impression that the officers would prevent him from leaving if he wanted to.

## 2.  Restraint by Physical Force or Threats

Regarding the second factor, Defendant states he was restrained and handcuffed for the first ten or fifteen minutes while the search warrant was being executed. (Mot. I

at 10; Defendant Decl. ¶¶ 6, 14.)  He argues that this is a stronger showing than was
sufficient in *Craighead*, where the defendant was not handcuffed or restrained at any
point.  *Craighead*, 539 F.3d at 1086.  However, in *Craighead* the second factor weighed
in favor of custody because the defendant was escorted to a storage room for questioning,
and during the questioning an armed detective wearing a "raid vest" leaned his back to
the door, blocking the defendant's exit.  *Id.* at 1086.  In order to get to the room's only
door, the defendant "would have either had to have moved the police detective or asked
him to move."  *Id.*  Therefore, the Court determined that his "freedom of action was
restrained in a way that increased the likelihood that [he] would succumb to police
pressure to incriminate himself."  *Id.*

Here, although Defendant was initially restrained and handcuffed because he did
not comply with the officers' initial commands,[6] (Opp. I at 6; Radisay Decl. ¶¶ 7–8), his
handcuffs were removed while he was told he was not under arrest and was free to leave.
(Opp. I at 7; *id.* Syvock Decl. ¶ 10.)  Only after he was given these advisements and
unhandcuffed, and indicated his willingness to talk, did he follow Detective Syvock to
the backyard where he received the advisements a second time before the start of any
questioning.  (Syvock Decl. ¶ 10; Opp. I Ex. B at 12:40:45–12:41:48.)  Detective Syvock
also told him that the reason the interview was taking place in the backyard was so that
Defendant would not be embarrassed in front of his neighbors, which would signal to a
reasonable person that officers did not interview him there in an effort to restrain him.
(Opp. I Ex. B at 12:40:45–12:41:48.)  The interview took place in an open, outdoor area,
and there were no officers blocking the door or stationed in the backyard.  (Syvock Decl.
¶ 14; Kottas Decl. ¶ 13; Evidentiary Hearing Ex. 1.)  At one point Defendant stood up
without asking for permission, stating that he was tired, and Detective Syvock asked if he

---

[6] Special Agent Kevin Radisay testified at the evidentiary hearing that after Defendant did not comply
with commands to put his hands above his head and exit the house, Agent Radisay used his hands to
take him outside.  However, at that point Defendant was compliant so the agent did not use excessive
force.

wanted to walk around and asked how much longer he would "give" the officers for questioning.  (Opp. I Ex. B at 13:53:08–13:53:30.)  Therefore, Defendant received strong and repeated indications that he was not restrained before and throughout the questioning, and his actions evidenced his understanding that he was not restrained.

Defendant argues that he was not permitted to enter the house to retrieve personal items or make a telephone call, that his keys and wallet were taken by law enforcement, and that his car was blocked by a squad car.  (Mot. I at 12.)  Defendant was prohibited from entering the house because the search was ongoing, and his mobile phone and car were among the items and places specifically to be searched.  (Dkt. 77 Ex. B; Opp. I Ex. B at 13:57:42–13:59:31.)  This scenario is typical of interrogations conducted while a search warrant is being executed, and the Ninth Circuit developed the *Craighead* factors to account for this.  *See Craighead*, 539 F.3d at 1083 ("A reasonable person interrogated inside his own home may have a different understanding of whether he is truly free 'to terminate the interrogation' if his home is crawling with law enforcement agents conducting a warrant-approved search. . . . We must, therefore, consider how to apply the traditional *Miranda* inquiry to an in-home interrogation.").  Additionally, the officers here did their best to accommodate Defendant's needs by calling his brother to relay Defendant's concerns for his mother and offering to retrieve a hair tie for him.  (*Id.* at 12:41:53–12:42:13, 12:41:53–12:42:13).  Defendant did not ask the officers to retrieve his wallet or other personal items for him, and notably, never indicated that he had any desire to leave.  Detective Syvock testified at the evidentiary hearing that if Defendant had made such requests or indicated a desire to leave, law enforcement would have made ensured that he received any necessary personal items.

//
//
//
//

-15-

### 3. Isolation From Others

Regarding the third factor, Defendant states that he was "kept isolated in the backyard patio during his interrogation, even though he sought to call his mother and brother to make sure his mother was safe and would not become emotionally distraught upon her return to the residence given the presence of all of the law enforcement officers." (Mot. I at 12–13.) In *Craighead*, the Ninth Circuit explained "[a] frequently recurring example of police domination concerns the removal of the suspect from the presence of family, friends, or colleagues who might lend moral support during the questioning and deter a suspect from making inculpatory statements." *Craighead*, 539 F.3d at 1087.

Defendant's argument is unavailing, however, since by Defendant's own admission he did not *want* his brother and mother to return to the house while the search was ongoing. (Mot. I at 12–13; Opp. I Ex. B at 12:39:15–12:39:51.) He did not seek to call them to comfort himself, but rather to prevent distress to his mother. (*Id.*) He was prohibited from making the call himself because his phone and house were part of the search, but the officers addressed his concerns about his mother by relaying Defendant's message to his brother. (Dkt. 77 Ex. B; Opp. I Ex. B at 12:41:53–12:42:13.) Therefore, Defendant was not isolated from moral support in a manner that would have made him succumb to questioning.

### 4. Whether the Suspect was Informed That He Was Free to Leave or Terminate The Interview, and the Context of Such Statements

Regarding the fourth factor, "[i]f a law enforcement officer informs the suspect that he is not under arrest, that statements are voluntary, and that he is free to leave at any time, this communication greatly reduces the chance that a suspect will reasonably

believe he is in custody. . . . The mere recitation of the statement that the suspect is free to leave or terminate the interview, however, does not render an interrogation non-custodial *per se*." *Craighead*, 539 F.3d at 1087 (emphasis in original).  Defendant argues that Detective Syvock's assurances that he was free to leave and not under arrest rang hollow in light of the police-dominated atmosphere.  (Mot. I at 13.)  Defendant notes that just minutes before Detective Syvock made these statements, Defendant was restrained, and even after his handcuffs were removed he was not permitted into his home.  (*Id.*)  Defendant likens his situation to that in *Craighead*, where the defendant was also told that he was not under arrest and was free to leave. (Mot. I at 14 (citing *Craighead*, 539 F.3d at 1089).)

In *Craighead*, however, the Court found that it was reasonable for the Defendant to conclude that he was not free to leave despite assurances to the contrary because (1) the presence of officers from three different agencies left him doubting whether the agent had the authority to speak on behalf of all of them, (2) an armed officer was blocking the storage room door, and (3) the interrogation took place in an unfurnished storage room. *Craighead*, 539 F.3d at 1087.

Here, the environment where the interview took place was nothing like that in *Craighead*.  The interview was held in Defendant's familiar, open-aired, and verdant backyard.  (Opp. I Ex. B.)  *See Craighead*, 539 F.3d at 1087 ("An interview conducted in a suspect's kitchen, living room, or bedroom might allow the suspect to take comfort in the familiar surroundings of the home and decrease the sensation of being isolated in a police-dominated atmosphere.").  There were no officers blocking the door or stationed in the backyard during the interview.  (Syvock Decl. ¶ 14; Kottas Decl. ¶ 13.)  Detective Syvock and Agent Kottas had not been part of the initial entry team and wore plain clothes throughout the questioning, (Syvock Decl. ¶¶ 9, 15; Kottas Decl. ¶¶ 9, 14; Evidentiary Hearing Ex. 1); Agent Kottas also testified at the evidentiary hearing that any

-17-

guns they carried were not visible.  Detective Syvock further explained that they were sitting in the backyard to avoid embarrassment to Defendant, signaling that they were trying to accommodate him rather than restrain him by bringing him there.  (Opp. I Ex. B at 12:40:45–12:41:48.) From these circumstances, it is clear that a reasonable person in Defendant's position would believe that he was free to leave or terminate the questioning.

Significantly, Detective Syvock *twice* told Defendant before questioning that he was not under arrest and was free to leave—both as he was removing Defendants handcuffs and again when they were seated in the backyard.  (Syvock Decl. ¶ 10; Opp. I Ex. B at 12:40:45–12:41:48.)  Defendant believed that Detective Syvock was in control of the operation, (Defendant Decl. ¶ 5), and Detective Syvock confirmed that all personnel were part of the same task force before he asked Defendant any questions. (Opp. I Ex. B at 12:42:27).  Defendant should have reasonably known that the detective's assurances were made on behalf of the entire team.

Defendant's own conduct demonstrated his understanding that he was free to leave.  During Detective Syvock's preliminary explanations, Defendant was calm and often nodded in agreement.  (Opp. I Ex. B at 12:42:27).  While Detective Syvock was giving Defendant a detailed explanation of their policies and procedures, Defendant even interrupted him to say it was not necessary and that they should "move on" to the questioning, but the detective insisted on finishing his preliminary explanations before asking him any questions.  (Opp. I Ex. B at 12:45:15–12:46:00).  Defendant voiced concerns about his mother, indicated his desire to stand up, and requested a hair tie, all of which the officers permitted and did their best to accommodate.  (*Id.* Ex. B at 12:41:53–12:42:13, 12:41:53–12:42:13, 13:53:03–13:53:08) Defendant's tone when answering

questions remained calm and civil.[7]  (*See, e.g. id.* at 13:07:07–13:08:46; *id.* at 13:37:57–13:38:17; *id.* at 13:52:17–13:52:56.)

At the evidentiary hearing, Defendant pointed to the final few pages of the transcript of the interview, where Detective Syvock asked Defendant for his car keys, and Defendant asked "I have to tell you or can I go get them?"  (Dkt. 108 at 80.)  Detective Syvock responded "You have to tell us. I'm not going to let you leave."  (*Id.*)  This statement was presented out of context, however.  The transcript shows that at that point, the interview had finished and Detective Syvock and Defendant were engaged in an extended discussion about the location of Defendant's keys.  When Defendant asked if he could go in the house to get them, Detective Syvock explained "[y]ou can't go where our investigators are because we don't know if you've got weapons hidden somewhere or something like that, so it's a safety thing for us" and then immediately reminded Defendant "But you're free to leave or go off wherever you want."  (*Id.* at 79–80.)  Defendant responded "there's no place I'm going."  (*Id.* at 80.)  This exchange took place immediately before Detective Syvock's statement "I'm not going to let you leave,"

---

[7] In his reply, Defendant also contends that law enforcement did not provide him with a copy of the search warrant in violation of Rule 41(f)(1)(C) of the Federal Rules of Criminal Procedure.  (Reply I at 7.)  Defendant maintains this alleged failure "further aggravated the atmosphere of police domination at the residence" and prejudiced him by "adding another layer of confusion."  (Reply I at 8.)  At the evidentiary hearing, the Government presented evidence that a copy of the search warrant was left on the dining room table in the house.  (Evidentiary Hearing Exs. 4 –8.)  In any event, this failure is generally not grounds to suppress evidence.  *United States v. Williamson*, 439 F.3d 1125,1132 (9th Cir. 2006) ("we have repeatedly held—and have been instructed by the Supreme Court—that suppression is rarely the proper remedy for a Rule 41 violation.").  As discussed extensively above, the circumstances surrounding the questioning here strongly indicate that a reasonable person in Defendant's position would have felt free to leave or terminate the questioning, so even if relevant, this failure does not tip the scales in favor of suppression.

Defendant also argues in his reply that he was likely to succumb to police pressure because "only minutes before law enforcement descended upon the residence, a confrontational, hour-long telephone call (arranged and recorded by law enforcement) was placed between Mr. Ornelas and an alleged sexual abuse complainant."  (Reply I at 7.)  Defendant does not appear to have known at the time the call was placed that law enforcement made the arrangements for the call, so this is unlikely to have affected Defendant's determination of whether he was free to leave or terminate the questioning.

indicating that the detective was talking about the car.  At the evidentiary hearing Detective Syvock also testified that he had meant he would not allow Defendant to leave with the *car* because it was part of the search.  Significantly, Detective Syvock did not ask any more questions or elicit any more incriminating statements afterwards making that statement.  (*Id.*)  Therefore, this statement does not undermine Detective Syvock's numerous assurances before and after the interview that Defendant was free to leave.

After analyzing the totality of circumstances, the Court concludes that Defendant was not in custody while the officers questioned him at his house. The factors outlined above demonstrate that the circumstances here were significantly less coercive than, and distinct from, those in *Craighead*, and that a reasonable person in Defendant's position would have felt free to leave or terminate the interview.  Therefore, the statements that Defendant made to law enforcement at his home were not obtained in violation of his *Miranda* rights and should not be suppressed.

**B.  Statements in the Squad Car**

Defendant also seeks to suppress statements he made to law enforcement in the squad car after his arrest.  (Mot. II at 2.)  The parties do not dispute that Investigator Jasper properly read Defendant his *Miranda* rights, but Defendant argues that the Government has not met its burden of demonstrating that Defendant "fully acknowledged an understanding of those rights or voluntarily, knowingly, and intelligently waived them." (*Id.* at 4.)  Defendant also contends that law enforcement engaged in an improper "deliberate two-step interrogation."  (*Id.* at 5.)  Finally, Defendant argues that his statements were not voluntarily made.  (*Id.* at 6.)  The Court considers each argument in turn.

### 1. Waiver of *Miranda* Rights

A defendant's inculpatory statements made during custodial interrogation are only admissible if the prosecution meets its heavy burden of showing that the defendant's waiver of *Miranda* rights was "voluntary, knowing, and intelligent." *United States v. Garibay*, 143 F.3d 534, 536 (9th Cir. 1998) (internal quotations and citations omitted). "A valid waiver of Miranda rights depends upon the totality of the circumstances including the background, experience, and conduct of defendant." *Id.*  A waiver is knowing and intelligent if, "under the totality of the circumstances, it is made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *United States v. Doe*, 155 F.3d 1070, 1074 (9th Cir. 1998).  A waiver is voluntary if, "under the totality of the circumstances, the confession was the product of a free and deliberate choice rather than coercion or improper inducement." *Id.*

"Waivers of *Miranda* rights need not be explicit; a suspect may impliedly waive the rights by answering an officer's questions after receiving *Miranda* warnings." *United States v. Rodriguez-Preciado*, 399 F.3d 1118, 1127 (9th Cir. 2005), *amended*, 416 F.3d 939 (9th Cir. 2005).  Where the defendant makes such a statement, the prosecution must also show that the defendant understood the rights he was impliedly waiving.  *Berghuis v. Thompkins*, 560 U.S. 370, 384 (2010).

Defendant argues that the Government has not met its burden of showing that he fully acknowledged an understanding of his *Miranda* rights, which he claims were read to him in a "rapid-fire fashion."  (Mot. II at 1, 4.)  At the outset of the audio recording of his interaction with Investigator Jasper, the investigator said "You asked about your rights, so I just wanted to make sure you understand them." (Opp. II Ex. 2 at 00:43–01:06.) Investigator Jasper then read Defendant each of his *Miranda* rights one at a time, asked

"do you understand?" after each one, and awaited confirmation each time from Defendant.  (*Id.*)  The investigator insisted on a verbal confirmation from Defendant, explaining "they make me ask you yes or no at the end of each one."  (*Id.*)  The record shows that Defendant affirmatively asked about his rights and was specifically asked whether he understood each one.  Considering the totality of the circumstances, there is ample evidence that Defendant did fully understand these rights.  *Cf. Berghuis*, 560 U.S. at 385 (there was "more than enough evidence in the record to conclude that [defendant] understood his *Miranda* rights," even though the defendant refused to sign a waiver form, because he was given a written copy of the warnings, the detective confirmed he could read and understand English, and he was given time to read the warnings).

Defendant also argues that he did not voluntarily, knowingly, or intelligently waive his *Miranda* rights.  (Mot. II at 4.)  The parties do not dispute that Investigator Jasper did not explicitly ask Defendant if he waived these rights.  (Mot. II at 4; Opp. II at 12–14.)  However, the Government contends that Defendant impliedly waived them.  (Opp. II at 12–14.)  "Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent."  *Berghuis*, 560 U.S. at 384.  The audio recording of the exchange between Investigator Jasper and Defendant demonstrate that Defendant's statements were not coerced, and in fact, he gave "no indication that he wished to remain silent."  *See Terrovona v. Kincheloe*, 912 F.2d 1176, 1180 (9th Cir. 1990).  To the contrary, after Investigator Jasper read Defendant his rights, they engaged in a friendly and lengthy discussion about a variety of topics and Defendant kept the conversation going.  (Opp. II Ex. 2 at 05:19–16:50.)  Defendant acknowledged his own eagerness to speak by saying at one point "if I get too political just tell me to shut up."  (*Id.* Ex. 2 at 10:10–10:12.)  And when Investigator Jasper wanted to continue their conversation about politics, he prefaced a question by saying "let me ask you this," to which Defendant responded "please."  (*Id.* Ex. 2 at 12:40–12:42.)

More importantly, Defendant's willingness to talk did not change when, ten minutes into the conversation, the investigator for the first time elicited incriminating statements by asking Defendant if any of the photographs seized from his home during the execution of the search warrant depicted his former students.  (*Id.* Ex. 2 at 16:50–17:06.)  The investigator prefaced the question by saying it was posed "just out of curiosity," and Defendant indicated that he was still willing to talk by saying "no, that's fine."  (*Id.* Ex. 2 at 16:50–17:06.)  Based on Defendant's statements and conduct, the Court finds that he knowingly, voluntarily, and intelligently gave an implied waiver of his *Miranda* rights.

### 2.  Deliberate Two-Step Interrogation

Next, Defendant contends that law enforcement engaged in an improper "deliberate two-step interrogation" in order to obtain his confession.  (Mot. II at 5.) "Such an interrogation occurs when an officer deliberately questions the suspect without *Miranda* warnings, obtains a confession or inculpatory admission, offers mid-stream warnings after the suspect has admitted involvement or guilt, and then has the suspect repeat his confession or elaborate on his earlier statements."  *United States v. Barnes*, 713 F.3d 1200, 1205 (9th Cir. 2013) (relying on *Missouri v. Seibert*, 542 U.S. 600, 616 (2004)).

Here, the Court has already determined that Defendant's initial statements to law enforcement at his home were not obtained in violation of *Miranda*.  Additionally, the Court notes that there is no evidence to support law enforcement's employment of a "deliberate" scheme to offer "mid-stream" warnings, since a reasonable person in Defendant's position would view the second set of questioning by a different officer as a new and distinct experience.  For example, in *Seibert*, there was a deliberate strategy in place because "the warned phase of questioning proceeded after a pause of only 15 to 20

minutes, in the same place as the unwarned segment." *Siebert*, 542 U.S. at 616.  Here, by contrast, Defendant was arrested after the questioning at his home and placed in a squad car where he and Investigator Jasper engaged in a lengthy and casual discussion about a variety of topics wholly unrelated to his charges before the investigator began eliciting incriminating statements.  (Opp. II Ex. 2 at 05:19–17:06.)  The *Miranda* warnings were not offered "mid-stream" and law enforcement properly determined that the warnings were necessary after the arrest because at that point Defendant was in custody. Therefore, there was no "deliberate two-step interrogation."

### 3.  Voluntariness

Finally, Defendant argues that his statements in the squad car were not voluntarily made.  (Mot. II at 6.)  "A voluntary statement is one that is the product of a rational intellect and free will.  No one factor is determinative.  Instead, the totality of the circumstances must be considered.  This includes both the characteristics of the accused and the details of the interrogation." *United States v. Kelley*, 953 F.2d 562, 564–65 (9th Cir. 1992) (internal citations and quotations omitted), *disapproved of on other grounds by United States v. Kim*, 105 F.3d 1579 (9th Cir. 1997).  Examples of involuntary statements include those obtained when the defendant was subject to lengthy questioning, denied food or sleep, physically threatened, or subject to psychological persuasion.  *Id.* at 565.

Here, there is no indication that Defendant's statements were not the product of rational intellect and free will.  The conversation between Defendant and Investigator Jasper was short—just over thirty minutes—and the investigator began eliciting incriminating information approximately ten minutes into the conversation.  (Opp. II Ex. 2.)  The conversation was friendly, and Defendant assured the investigator at one point that his questioning about child pornography was "fine" and later thanked the investigator for being "respectful."  (*Id.* Ex. 2 at 16:50–17:06, 29:40–32:18.)  The investigator was

never aggressive and never made any threats, and Defendant had not been deprived of food, sleep, or other important needs. (*Id.* Ex. 2.) Furthermore, when the investigator asked Defendant about the types of pornography he likes to view, Defendant casually stated "I don't want to get into detail about that," and then successfully changed the topic of conversation. (Opp. Ex. 2 at 19:36–19:55.) The circumstances of the conversation and Defendant's ease in declining to answer a specific question strongly demonstrate that his statements to Investigator Jasper were voluntarily made.

## IV.  CONCLUSION

For the foregoing reasons, Defendant's motions to suppress both sets of statements, (Dkt. 57; Dkt. 73), are DENIED.

DATED:      September 27, 2016

_____

CORMAC J. CARNEY

UNITED STATES DISTRICT JUDGE